## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

ROBERT SHELTON,  
       Plaintiff

    v.

CITY OF CINCINNATI, et al.,  
       Defendants

Case No. 1:11-cv-381  
Litkovitz, M.J.

**ORDER**

Plaintiff Robert Shelton brings this action alleging employment discrimination and

retaliation against his employer, the City of Cincinnati ("City") and the City's former Fire Chief,

Robert Wright ("Wright"). The matter is before the Court on defendant Wright's motion for

summary judgment (Doc. 22), plaintiff's opposing memorandum (Doc. 31), and Wright's reply

in support of the motion (Doc. 33), and upon the City's motion for summary judgment (Doc. 24),

plaintiff's opposing memorandum (Doc. 30), and the City's reply in support of its motion. (Doc.

32).

### I. Undisputed Facts

Plaintiff has been employed by the City as a firefighter since February of 1995. (Pltf.

Depo. at 8). Defendant Robert Wright served as Chief of the City's Fire Department until his

retirement in January 2011. (Wright Depo. at 6). The last day on which Wright reported to work

was on or around November 8, 2010. (*Id.* at 6-7).

Plaintiff was diagnosed with diabetes prior to beginning his employment with the City.

He disclosed his diabetes to the City's Employment Health Service ("EHS") in 1994 during a

pre-employment health screening. (Pltf. Depo. at 11).

## A. City policies

A Labor-Management Agreement (LMA) in effect between the City and the local union at all relevant times governed the process for returning a firefighter to duty following certain absences. (Doc. 22 at 9, citing LMA at § 28.6).[1] Pursuant to the process, the Fire Department can require a member who has missed three or more continuous tours on account of sickness with pay ("SWP") to be evaluated by EHS prior to returning to duty. (Doc. 30-2 at 3). The Fire Department can likewise require a firefighter who has used SWP for a specified condition, including pneumonia, to undergo an EHS exam prior to returning to work. (*Id.*). EHS makes the determination as to whether an individual can perform the functions of a firefighter. (Ronald Texter[2] Depo. at 59). In ascertaining an individual's fitness for duty, the focus is on whether the employee can perform his job safely and without harming himself or others. (Dr. Ariff Mehter, M.D., Depo. at 35). According to Dr. Mehter, the City's full-time EHS physician since July 2004, EHS is limited to requesting whatever medical records are relevant to ascertaining a member's fitness for duty when performing its evaluation. (Mehter Depo. at 6-7, 34).

Section 32.8 of the LMA, "Limited Duty," provides that members "who suffer temporary disabilities from on or off duty injuries may, upon recommendation of the EHS physician, be placed on limited duty." (Doc. 23, Exh. 11). The member may submit for consideration medical records from his personal/treating physician regarding the limited duty determination, and the EHS physician is required to include and consider recommendations submitted by the personal/treating physician regarding the limited duty determination. (*Id.*). The decision to offer

---

[1] Defendant Wright asserts that Exhibit 11 contains the relevant pages from the LMA. (Doc. 22 at 9, n. 2). Exhibit 11 does not contain the relevant pages of the LMA, but the relevant provision is included in an arbitrator's decision found at Doc. 30-2.
[2] Texter was the Fire Department's Safety Risk Manager from 2003 to March 2011.

medical limited duty is made by the EHS physician. (Texter Depo. at 51). An individual assigned to light duty is paid his regular pay. (Texter Depo. at 59).

Pursuant to § 28.12 of the LMA, if the EHS physician determines that the member should be medically separated and the member's treating physician disagrees, the City and the member will mutually select a third physician to resolve the disagreement. (Doc. 23, Exh. 11). The third physician's decision "shall be submitted to the Department Head or his designee for consideration in determining whether medical separation is appropriate." (*Id.*). The third-physician review process set forth in § 28.12 of the LMA was the procedure by which a firefighter could challenge a light-duty assignment. (Texter Depo. at 39-41).

### B. Plaintiff's medical and work history

#### 1. February 2004 hypoglycemic episode

Plaintiff had a hypoglycemic episode while working at a two-alarm fire scene in February 2004. (Mehter Depo. Exh. 54). He felt weak and was told he had "mental status changes." (*Id.*). When examined by Dr. Mehter the following day, the episode was found to be resolved and plaintiff was returned to full duty. (*Id.*).

#### 2. August 2004 - October 2005 illnesses and hypoglycemic episode

In August of 2004, plaintiff took a leave of absence from work under the Family and Medical Leave Act (FMLA) and SWP for surgery on his uvula and palate. (Mehter Depo. Exh. 67, p. 2; Pltf. Depo. at 19-20). When plaintiff was ready to return to work, he presented a note from his doctor to EHS. (Pltf. Depo. at 20). The EHS records indicate that plaintiff telephoned on December 14, 2004, and stated he was having some problems with his blood sugar and chest pain. (Mehter Depo. Exh. 67, p. 2). Plaintiff reported he had seen his primary care physician and had undergone a stress test, which was normal, and his blood pressure had been elevated but

3

was now 122/80 after his medication was readjusted. (*Id*.). Plaintiff stated he wanted to return to work and he had a note from his doctor. (*Id*.). He was advised he needed to get his records and to sign releases, and he was informed he would probably be put on limited duty until the records were received. (*Id*.). Plaintiff was placed on limited duty effective December 16, 2004.[3] (Doc. 23, Exh. 2).

During early 2005, plaintiff was in contact with EHS on several occasions concerning the release of his medical records. (Mehter Depo. Exh. 67, p. 3). Plaintiff refused to release some of the requested medical records as he did not believe they were pertinent to the fitness-for-duty examination. (Doc. 23, Exhs. 2, 3). On January 19, 2005, plaintiff filed a formal grievance based on EHS's refusal to release him to return to work despite the information provided by his treating physicians. (Doc. 23, Exh. 2; Pltf. Depo. at 13-14).

On April 4, 2005, Texter advised plaintiff that the EHS physician could not make an informed opinion regarding plaintiff's fitness for duty without the full release of plaintiff's medical records pertinent to his absence from work beginning August 19, 2004. (Doc. 23, Exh. 4). Texter asked plaintiff to sign a release for that period and informed plaintiff that his refusal to cooperate made it unreasonable to expect the Fire Department to maintain his limited duty status indefinitely during the conflict with EHS. (*Id*.). Texter further stated:

> Article 32, Section 8, Paragraph (A) of the Labor Management Agreement states:
> "Members of the Fire Department who suffer temporary disabilities from on or
> off duty injuries may, upon recommendation of the Employee Health Physician,
> be placed on Limited Duty." The operative word in the statement is "MAY."
> Limited Duty is a privilege not a right and can be denied and revoked if the
> circumstances so indicate. Secondly, you are not on Limited Duty from an on or
> off duty injury. You were placed in this status only to provide a grace period until
> appropriate documentation could be provided to EHS. Since this appears not to
> be happening, Limited Duty will no longer be offered as an option.

---

[3] In a grievance he subsequently filed, plaintiff stated he was placed on limited duty effective December 16, 2005. (Doc. 23, Exh. 2). However, it is apparent that there is a typographical error in the exhibit and the actual date he was placed on limited duty was December 16, 2004.

> Article 28, Section 4, states: "Members returning from a serious health condition as defined under the Family Medical Leave Act (FMLA) may be required by the Fire Department to be evaluated by a city-approved licensed health care provider prior to return to duty. . . ."

(Doc. 23, Exh. 4).

Texter advised plaintiff that he could use his accrued leave time while the matter was being resolved; plaintiff would not be offered any duty status until released as "fit for duty" by the City physician; and he would therefore be carried in a leave without pay status after his leave time had been exhausted and until the matter was finally resolved. (*Id.*). Texter strongly urged plaintiff to reconsider his position on providing the necessary documentation to the City physician so that the matter could be resolved. (*Id.*). On October 6, 2005, the Fire Department and the local union entered into an agreement that resolved plaintiff's grievance and permitted plaintiff to return to limited duty so long as he provided EHS with all of the requested medical records. (Doc. 23, Exh. 5).

In October of 2005, plaintiff experienced a hypoglycemic event while in his automobile on his way to work. (Mehter Depo. Exh. 61). Plaintiff had skipped breakfast because he was "running late" and intended to eat at work, and he lost consciousness at an intersection. (*Id.*). He did not have an accident and reported afterwards to his physician, Dr. Kenneth Kreines, M.D., that he since understood the importance of never delaying a meal. (Mehter Depo. Exh. 58). In the wake of that incident, the Fire Department requested that plaintiff be given "a complete physical examination concerning his general health condition as related to his most recent incident of incapacitation, in light of his documented medical history. . . ." (Mehter Depo. Exh. 59). EHS physician Dr. William Kelley, M.D., issued an opinion on November 21, 2005, stating that he had received the office records from plaintiff's attending physician and it was Dr.

5

Kelley's medical opinion that plaintiff "has a medical condition that places him and others at risk of injury during the performance of unrestricted firefighting. I recommend that he not perform unrestricted firefighting. His condition is not expected to prohibit restricted duty provided he does not drive City vehicles or work around open dangerous machinery or at unprotected heights." (Mehter Depo. Exh. 60). Dr. Kelley opined that plaintiff should be able to commence restricted duty when cleared for it by his attending physician. (Id.).

In response to Dr. Kelley's opinion, plaintiff submitted a letter from his treating physician, Dr. Kreines, dated November 30, 2005. (Mehter Depo. Exh. 58). Dr. Kreines stated that plaintiff had Type II diabetes of approximately 13 years duration for which he was treated with insulin. Dr. Kreines recounted the two insulin reactions plaintiff had experienced over the last several years: (1) the incident at the fire scene one year earlier when plaintiff was required to fight two fires in rapid succession without time for a meal, and (2) the attack plaintiff had in his car at the intersection in October. Dr. Kreines stated that plaintiff had been seen in the office three times by diabetes educators and was "progressing nicely toward a clearer understanding of his treatment." (Id.). Dr. Kreines stated it was his medical opinion that "if Mr. Shelton carefully follows the directions which we are providing he should be able to safely perform unrestricted duties as a firefighter. His kidney involvement and elevated blood pressure are warning signs that he must improve his diabetes control but are not contraindications at this stage as to his employment as an unrestricted firefighter." (Id.).

Because there was a conflict between the EHS physician and plaintiff's physician as to whether plaintiff could return to full duty, Dr. Malcolm Steiner, M.D., performed an independent assessment on May 19, 2006. (Mehter Depo. Exh. 61). Dr. Steiner assessed whether plaintiff could safely perform unrestricted firefighting duties given his Insulin Treated Diabetes Mellitus.

6

(*Id.*). Dr. Steiner concluded that plaintiff could "work unrestricted as a fire fighter within a safe practice protocol," which meant that he needed to follow "established guidelines for nutritional, insulin therapy and monitoring practices under the care of a Diabetes specialist in order to safely perform as a firefighter." (*Id.*). Plaintiff agreed to release his medical records on June 7, 2006, pertinent to the independent third physician review. (Pltf. Depo. at 22).

Defendant Wright decided to return plaintiff to full duty on June 9, 2006, with certain conditions. (Mehter Depo. Exh. 62). Plaintiff was required to follow established nutritional guidelines, insulin therapy, and monitoring practices under the care of a diabetes specialist as noted by Dr. Steiner. (*Id.*). Wright testified that Dr. Kelley disagreed with his decision. (Wright Depo. at 18-19). Wright subsequently sent an email to EHS in which he stated that it appeared EHS physicians and Chuck Haas, the City's Risk Manager, were disappointed that he had decided to return plaintiff to full duty and were opposing "this legitimate resolution of his situation." (Wright Depo. at 12; Wright Depo. Exh. 33).

### 3. September 2007 illness

On September 8, 2007, plaintiff became ill at work and began vomiting upon completing a run at 2:45 a.m. (Mehter Depo. Exh. 63). Plaintiff planned to drive home but was advised by his coworkers to call his wife, who picked him up and drove him to the hospital. (*Id.*). Plaintiff was initially diagnosed with pneumonia or possible pneumonia and admitted to the hospital for four days. (Tr. 30-31, 152-53; Mehter Depo. Exh. 65). Wright requested that plaintiff undergo a fitness-for-duty examination after it was reported to him that plaintiff was "incoherent" when he left the station and had been hospitalized. (Wright Depo. at 21). It was also reported to Wright that plaintiff had pneumonia and it was a minor illness. (*Id.* at 24). Wright could not recall another instance that was not related to substance abuse or an on-the-job injury where he had

7

ordered a firefighter to undergo a fitness-for-duty examination. (Wright Depo. at 23). Although plaintiff was admitted to the hospital with a diagnosis of possible pneumonia (Mehter Depo. Exh. 65), during his hospital stay plaintiff was found to be suffering from acute respiratory failure, stage 4 chronic kidney disease, severe aortic valve disorder, unspecified anemia, and fluid overload. (Pltf. Depo. at 31).

When plaintiff returned to work, his captain informed him that Wright was requiring plaintiff to undergo a fitness-for-duty examination. (Pltf. Depo. at 143). Plaintiff questioned why this was required as he had missed only one tour, not three consecutive tours as required under the LMA. (Id. at 143-47). The captain informed plaintiff that it was Wright's discretion as to whether to require an exam under the LMA because plaintiff had pneumonia. (Tr. 144-45). On October 4, 2007, Texter requested that EHS give plaintiff a complete physical examination concerning his general health condition as related to the incident. (Mehter Depo. Exh. 59).

Plaintiff reported for a fitness-for-duty examination and was examined by Dr. Kelley on October 16, 2007. Dr. Kelley informed plaintiff that he had heard plaintiff had "passed out" at work, which plaintiff denies had occurred. (Pltf. Depo. at 151). At the conclusion of the examination, Dr. Kelley reported that he had "already given the Fire Department my opinion about his duty status. I do not think he should do unrestricted firefighting. He doesn't even meet the DOT [Department of Transportation] exemption criteria for driving with his hypoglycemic episodes." (Mehter Depo. Exh. 63). Dr. Kelley stated he could not give an additional duty status opinion in view of the most recent event without adequate information about the event. (Id.).

On November 5, 2007, Texter sent plaintiff a memorandum from Dr. Kelley advising plaintiff that the last records he submitted were not sufficient for Dr. Kelley to complete an independent medical review for plaintiff's fitness-for-duty examination. (Doc. 23, Exh. 9).

Texter advised plaintiff that he needed to provide the requested records and if he failed to make arrangements to do so or unduly delayed the process, he would be suspended until he complied or was cleared for full duty by the EHS physician. (*Id.*).

On November 29, 2007, Dr. Kelley reported that plaintiff's hospital records had been obtained and that plaintiff had "progressively worsening medical conditions other than the condition for which he was restricted per my memo of 11/21/2005. In light of these additional conditions it is my recommendation that he be limited to light duty." (Mehter Depo. Exh. 68). On December 21, 2007, Dr. K. Shashi Kant, M.D., a treating physician who was following plaintiff for "chronic kidney disease in the setting of type II diabetes," wrote that plaintiff was currently asymptomatic from most of his conditions and had no evidence of any symptoms related to his chronic kidney disease. (Mehter Depo. Exh. 69). Dr. Kant stated that plaintiff should be able to return to his "full, unrestricted firefighting duties." (*Id.*). He stated that plaintiff was being reevaluated periodically and was in the process of being evaluated for a future renal transplant. (*Id.*).

On March 3, 2008, plaintiff requested a third-party physician review. (Pltf. Depo. at 44). The parties had difficulty agreeing on a third-party physician, and plaintiff remained on light duty through 2008. (Pltf. Depo. at 45). On or about February 23, 2009, Texter requested a third-physician review for plaintiff. (Doc. 23, Exh. 11). On March 10, 2009, plaintiff declined the third-party physician selected by the City to perform the fitness-for-duty examination. (Pltf. Depo. at 57; Doc. 23, Exh. 13).

On September 29, 2009, Texter wrote plaintiff a letter captioned "Medical Separation Process." (Doc. 23, Exh. 17). Texter stated in the letter that it had been discovered during the search for a third-party physician to provide the "Third Physician Review" that plaintiff had

9

failed to disclose one of his treating physicians. Texter informed plaintiff that if he did not provide a signed release for that physician's medical records within two weeks, his limited duty privileges would be revoked in October 2009 and the process of separation from the City would be implemented 90 days later on December 29, 2009. On October 1, 2009, plaintiff filed a grievance on the ground that he was being denied the third-party physician review under § 28.12 of the LMA and was also being denied limited duty for refusing to release his medical records. (Doc. 23, Exh. 11). Plaintiff requested that he be granted a third-physician review and that he be permitted to remain in a limited-duty status pending the final outcome of the third-physician review process.

Subsequently, in November 2009, Wright removed plaintiff from paid limited-duty status. According to Texter and Wright, plaintiff was removed from limited-duty status because he was not cooperating in the third-party physician review process and he refused to sign a medical release for EHS to obtain his medical records. (Wright Depo. at 30-31; Texter Depo. at 60). Plaintiff did not receive a salary after he was removed from limited-duty status but he continued to receive benefits. (Texter Depo. at 61).

Plaintiff's grievance proceeded to arbitration and a decision was rendered on March 11, 2010. (Doc. 30-2, Pltf. Depo. Exh. 12). The arbitrator sustained the grievance; determined that the third-party physician review process was to be completed; decided that plaintiff must release his medical records only if the third-party physician decided he needed them to evaluate plaintiff's ability to return to full, unrestricted firefighting duty; and ordered that plaintiff be returned to limited duty while the third-party physician review process continued. The City contacted plaintiff and offered to return him to limited duty pending the third-party physician review process. (Pltf. Depo. at 53). Plaintiff did not return to limited duty at that time, and the

third-party physician review process continued. (*Id.*). Returning plaintiff to limited duty would have interfered with the outside jobs he held at the time. (*Id.* at 54).

Plaintiff was hospitalized after undergoing heart valve surgery in June 2010, and he was kept off work by his doctor for five weeks. (Pltf. Depo. at 54-55). Plaintiff subsequently had a kidney transplant in November 2010. (*Id.* at 88). Chief Wright reported for his last day of work that same month.

Following a six-week recuperation period for the kidney transplant surgery, plaintiff was cleared to return to limited-duty status on or about January 3, 2011. (Pltf. Depo. at 88-89). Between January 27 and March 25, 2011, plaintiff's various transplant and treating physicians rendered opinions that plaintiff was capable of returning to full unrestricted firefighting duty. (Mehter Depo. Exhs. 78-81). EHS physician Dr. Mehter issued an opinion dated February 23, 2011, that plaintiff could return to work with the restrictions imposed by Dr. Kelley on November 21, 2005 and November 29, 2007. (Mehter Depo. Exh. 82). Texter initiated a request for a third-party physician exam shortly thereafter, which Dr. Susan S. Stegman performed. (Pltf.'s Depo. at 91). On May 17, 2011, Dr. Stegman gave her "very strong opinion" that plaintiff could return to "full, unrestricted firefighting duty effective immediately." (Mehter Depo. Exh. 83). Dr. Stegman stated that she could find "no medical reason to delay this ruling any further." (*Id.*). Plaintiff was subsequently returned to full duty and has remained in that status. (Pltf. Depo. at 91-92).

As a result of being placed on limited-duty status, plaintiff's hours were changed, which precluded him from earning extra income at his other part-time jobs, and he was required to use holiday and sick time to fulfill his obligations to his other jobs. (Pltf. Depo. at 120-21, 141-42).

## C. Paramedic program

In 2008 or 2009, the City instituted its Paramedic Training Program ("PTP"). (Locasto Depo. at 8). City firefighters are able to participate in the program free of charge. (Wright Depo. at 39). Plaintiff was enrolled in the 2009 PTP class, while he was on paid limited-duty status. (Locasto Depo. at 8-9). On or about April 7, 2009, the City removed plaintiff from the PTP at Chief Wright's direction because plaintiff purportedly could not complete the program requirements. (Locasto Depo. at 19-20; Wright Depo. at 43). Specifically, a participant in the program must complete "ride time," which involves riding with certified paramedics and observing their work in the field. (Locasto Depo. at 17). Wright testified that he decided to not allow plaintiff to obtain his ride time with the City because historically an individual who was on limited duty did not ride on Fire Department equipment. (Wright Depo. at 46-47). Plaintiff was initially told it would be acceptable if he could get his ride time with a fire department other than the City of Cincinnati (*Id.* at 42), and plaintiff advised the City that he would be able to obtain his ride time outside the City. (Pltf. Depo. at 72-73). However, Wright testified that he subsequently decided to remove plaintiff from the program because the other fire departments with whom plaintiff could ride wanted Wright to sign a waiver indemnifying them against any issues, which Wright could not do (Wright Depo. at 42), and Wright was informed by the City's Medical Director, Dr. Locasto, that other requirements of the program could not be substituted for ride time. (Wright Depo. at 42-43). Dr. Locasto testified that from his perspective as Medical Director, plaintiff's "light duty" status would not have affected his ability to complete the program in any way. (Locasto Depo. at 15). Dr. Locasto testified that at some point he became aware plaintiff was receiving dialysis while participating in the PTP, but this would not

12

have prevented plaintiff from successfully completing his ride time on City units without any accommodation. (Locasto Depo. at 17-18).

Plaintiff filed a charge of discrimination with the Ohio Civil Rights Commission ("OCRC") on April 20, 2009, alleging that he was unlawfully removed from the PTP based on a perceived disability. (Doc. 23, Exh. 23).

## II. Summary Judgment Standard

Fed. R. Civ. P. 56 allows summary judgment to secure a just and efficient determination of an action. The court may only grant summary judgment as a matter of law when the moving party has identified, as its basis for the motion, an absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

The party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253 (1968)). The evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 (1970)). However, a district court need not view the facts in the light most favorable to the nonmoving party if that party's version of events is "blatantly contradicted by the record, so that no reasonable jury could believe it." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The court is not to weigh the evidence and determine the truth of the matter but is to decide whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. There is no genuine issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Id.* (citing *Cities Serv.*, 391 U.S. at 288-289). If the evidence is merely

colorable, *Dombrowski v. Eastland*, 387 U.S. 82, 84 (1967), or is not significantly probative,

*Cities Serv.*, 391 U.S. at 290, judgment may be granted. *Anderson*, 477 U.S. at 249.

## III. Claims against the City

### A. Disability discrimination claims

#### 1. Applicable law

The ADA applies to the alleged discriminatory acts that occurred in this case prior to

January 1, 2009. The Americans with Disabilities Act Amendments Act of 2008 ("ADAAA")

applies to the alleged discriminatory acts that occurred after January 1, 2009.[4]

Federal law makes it unlawful for a covered employer to discriminate against a qualified

individual on the basis of disability with respect to discharge and "employee compensation, job

training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

The Ohio Civil Rights Act provides that it shall be an unlawful discriminatory practice "[f]or any

employer, because of the . . . [disability] . . . of any person . . . to discriminate against that person

with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter

directly or indirectly related to employment." Ohio Rev. Code § 4112.02(A). The analysis of

plaintiff's disability discrimination claims is generally the same under both the federal and state

statutes. *See Jakubowski v. The Christ Hospital*, 627 F.3d 195, 201 (6th Cir. 2010) (citing

*Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 872 (6th Cir. 2007) (citation omitted)).

To establish his claim for disability discrimination under the ADA, a plaintiff must show:

(1) he is disabled, (2) he is qualified to perform the job requirements with or without reasonable

accommodation, and (3) he suffered an adverse employment decision because of the disability.

*Frengler v. General Motors*, No. 11-3378, 2012 WL 2044419, at *2 (6th Cir. June 7, 2012)

---

[4] The ADA was amended by the ADAAA effective January 1, 2009. The ADAAA does not apply to pre-amendment conduct. *Milholland v. Sumner County Bd. of Educ.*, 569 F.3d 562 (6th Cir. 2009).

(citing *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312 (6th Cir. 2012) (en banc); *Donald v. Sybra, Inc.,* 667 F.3d 757, 763 (6th Cir. 2012)). *See also Henderson v. Ardco, Inc.,* 247 F.3d 645, 649 (6th Cir. 2001). The plaintiff must establish that his disability was a "but for" cause of the employer's adverse employment action. *Lewis,* 681 F.3d 312. The employee need not "show that the disability was the 'sole' cause of the adverse employment action." *Id.* at 316.

A plaintiff can establish a claim of disability discrimination through either direct or indirect evidence.[5] Direct evidence is "that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Amini v. Oberlin College*, 440 F.3d 350, 359 (6th Cir. 2006) (race discrimination) (quoting *Kocak v. Cmty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 470 (6th Cir. 2005)); *Grizzell v. City of Columbus Div. of Police*, 461 F.3d 711, 719 (6th Cir. 2006) (Title VII). Direct evidence must prove not only discriminatory animus, but also that the employer actually acted on that animus. *See Amini*, 440 F.3d at 359. Direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that a challenged employment action was motivated at least in part by prejudice against members of the protected group. *Wells v. Cincinnati Children's Hosp. Med. Ctr.,* 860 F. Supp. 2d 469, 479-80 (S.D. Ohio 2012) (Beckwith, J.) (citing *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003)).

---

[5] To make out a prima facie case of disability discrimination through indirect evidence, a plaintiff must show: 1) he is disabled; 2) he is otherwise qualified for the position, with or without reasonable accommodation; 3) he suffered an adverse employment decision; 4) the employer knew or had reason to know of plaintiff's disability; and 5) the position remained open while the employer sought other applicants or the disabled individual was replaced. *Whitfield v. Tennessee*, 639 F.3d 253, 258-259 (6th Cir. 2011) (citing *Macy v. Hopkins Cnty. Sch. Bd. of Educ.*, 484 F.3d 357, 365 (6th Cir. 2007) (quoting *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1186 (6th Cir. 1996)). Once the plaintiff makes out a prima facie case, the burden shifts to the defendant to articulate a non-discriminatory explanation for the employment action. *Id.* at 259 (citing *McDonnell Douglas Corp. V. Green*, 411 U.S. 792, 802-04 (1973); *Daugherty v. Sajar Plastics, Inc.,* 544 F.3d 696, 703 (6th Cir. 2008)). If the defendant does so, the burden shifts back to the plaintiff to prove that the defendant's explanation is pretextual. *Id.* at 260 (citations omitted).

Where there is direct evidence that the employer relied on the employee's impairments in making an adverse employment decision, the *McDonnell Douglas* burden-shifting format does not apply.[6] *See Wells,* 860 F. Supp. 2d at 479-80 (citing *Monette,* 90 F.3d at 1184, abrogated on other grounds by *Lewis,* 681 F.3d 312). Instead, the plaintiff must prove he is "disabled" within the meaning of the Act and that he was "otherwise qualified for the position." *Id.* (citing *Monette,* 90 F.3d at 1186). An individual is not "a qualified individual with a disability" so as to satisfy the second element of a disability claim if the individual "poses a 'direct threat' to the health or safety of others. . . ." *Wurzel v. Whirlpool Corp.,* No. 10-3629, 2012 WL 1449683, at *9 (6th Cir. April 27, 2012); 42 U.S.C. § 12111(3). *See also* 29 C.F.R. § 1630.2(r). However, an employer cannot deny an employment opportunity to an individual with a disability because of a slightly increased risk of harm. *Wurzel,* 2012 WL 1449683, at *9. There must be "a significant risk, *i.e.* high probability, of substantial harm; a speculative or remote risk is insufficient." *Id.* (quoting *Estate of Mauro By and Through Mauro v. Borgess Medical Center,* 137 F.3d 398, 402 (6th Cir. 1998)).

### 2. The City is not entitled to summary judgment on plaintiff's disability discrimination claims.

Plaintiff claims that the City discriminated against him by subjecting him to a number of adverse job actions because the City perceived him to be disabled with respect to the major life activity of working in violation of the ADA, the ADAAA, and Ohio Rev. Code Ch. 4112. The Court will address each of these adverse job actions in turn.

---

[6] The *McDonnell Douglas* burden-shifting format applies where the plaintiff seeks to prove his case by circumstantial evidence. *See Monette,* 90 F.3d at 1184-85. Although the parties analyze plaintiff's disability discrimination claims in the context of the *McDonnell Douglas* framework, the record contains direct evidence that the City perceived plaintiff as being disabled.

The first adverse job action is the City's refusal to reinstate plaintiff to full-duty status through December 2008 following his brief illness and hospitalization in September 2007. Plaintiff claims that the City's refusal to reinstate him to full-duty status during this time period violated the ADA and the Ohio statute. Plaintiff contends that a reasonable jury could disbelieve the City's stated reason that it found plaintiff was unfit for the job of firefighting and instead determine that the City acted as it did because it perceived him to be disabled due to his diabetes. (Doc. 30 at 13-14).

This adverse job action is properly analyzed under the direct evidence framework. Plaintiff has introduced direct evidence that the City refused to return him to full duty following his hospitalization in 2007 and during 2008 because of his diabetic condition. In an interdepartmental memorandum dated November 21, 2005, Dr. Kelley opined that plaintiff was precluded from working in any job involving driving City vehicles, working around open dangerous machinery, or working at unprotected heights following plaintiff's October 2005 hypoglycemic (diabetic) event. (Mehter Depo. Exh. 60). Dr. Kelley referenced the interdepartmental memorandum outlining these restrictions when he recommended to Texter on November 29, 2007, that plaintiff be limited to light duty. (Mehter Depo. Exh. 68). In turn, Dr. Mehter's November 18, 2008 memorandum limiting plaintiff to light duty is based on Dr. Kelley's November 29, 2007 memorandum. (Mehter Depo. Exh. 71). Additionally, EHS records dated June 10, 2008, indicate that "permanent restrictions" listed in the November 21, 2005 memorandum were verified in a telephone call to Texter on June 10, 2008. (Mehter Depo. Exh. 67, p. 9). This direct evidence shows that the City relied on restrictions its physicians imposed as a result of plaintiff's diabetic condition to restrict him from full duty.

Plaintiff must therefore prove that he was "disabled," which he seeks to do by showing the City regarded him as substantially limited in the major life activity of working, and that he was qualified to perform the essential functions of his position. The ADA (and not the ADAAA) applies to this time period.

The prior version of the ADA defined a "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2) (2006). "Working" is included among the "major life activities" listed under the regulations accompanying the ADA. To show he was substantially limited in the major life activity of working, an individual had to establish that his impairment substantially limited his ability to perform "a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 491 (1999) (quoting 29 C.F.R. § 1630.2(j)(3)(i) (1998)); *Daugherty v. Sajar Plastics, Inc.,* 544 F.3d 696, 704 (6th Cir. 2008). *See also Donald v. Sybra, Inc.*, 667 F.3d 757, 764 (6th Cir. 2012) (under the prior version of the Act, in order to be regarded as disabled, an individual "must be regarded as having an impairment that limits a major life activity."). "The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working" under the ADA. *Daugherty*, 544 F.3d at 704.[7]

---

[7] In contrast, the Ohio Civil Rights Act does not require that an individual who claims his employer regarded him as disabled to show that the employer also believed that the perceived disability limited a major life activity. *Wells*, 860 F.Supp.2d at 478 (citing Ohio Rev. Code § 4112.01(13)) ("'Disability' means a physical or mental impairment that substantially limits one or more major life activities, including . . . working; a record of a physical or mental impairment; or being regarded as having a physical or mental impairment."); *Scalia v. Aldi, Inc.*, No. 25436, 2011 WL 6740756, at **7-8 (Ohio App. 9th Dist. Dec. 21, 2011). As plaintiff has presented evidence establishing material issues of fact under the ADA standard, he necessarily meets the lower threshold under Ohio law.

The City contends that under the ADA, an individual is regarded as disabled only if an employer mistakenly believes that he has an actual, non-limiting impairment that substantially limits one or more major life activities. (Doc. 24 at 11, citing *Sutton*, 527 U.S. at 489; *Murphy v. UPS*, 527 U.S. 516, 521-22 (1999)). The City argues that plaintiff cannot meet this standard under the ADA with respect to the 2007 action restricting him from returning to full duty because the most plaintiff has shown is that the City decided to keep him on limited duty because he was not able to fulfill the duties of an active full-duty firefighter. (Doc. 24 at 11-12, citing *Williams v. Stark County Bd. of County Comm'rs*, 7 F. App'x 441 (6th Cir. 2001)). The City asserts this is insufficient to establish that it regarded plaintiff as unable to perform a class of jobs or a broad range of jobs in various classes. Plaintiff asserts the restrictions the City imposed on him would preclude him from working a wide range of jobs.

Neither party cites any authority from the Sixth Circuit or any other court as to whether the restrictions imposed by the City would preclude plaintiff from performing a class of jobs or a broad range of jobs in various classes. At least one district court from outside the Sixth Circuit has determined that while driving is not a major life activity, a restriction against operating commercial vehicles may constitute a significant restriction on the ability to perform a particular class of jobs. *See Schlegel v. Berks Area Reading Transp. Auth.*, No. CIV. A. 016055, 2003 WL 21652173 (E.D. Pa. Jan. 9, 2003). Similarly, because it appears the restrictions imposed by the EHS physicians during the 2007-2008 timeframe would preclude plaintiff from operating commercial vehicles, as well as from performing other categories of work activities, there are genuine issues of material fact as to whether the City perceived plaintiff to be substantially limited in the major life activity of working.

The next issue to be resolved is whether plaintiff was qualified to perform the full duties of a firefighter during the 2007-2008 time period. The City asserts that plaintiff was not a qualified individual with a disability. Although the City has not clearly articulated its argument, the City appears to contend that plaintiff could not perform unrestricted firefighting duties because he posed a direct threat to his safety and that of others due to having experienced hypoglycemic episodes. (Doc. 24 at 12-13). The City asserts that Dr. Kelley examined plaintiff after his September 2007 illness; Dr. Kelley noted plaintiff had not been a reliable historian regarding his insulin use; and Dr. Kelley opined that plaintiff should not perform unrestricted firefighting duties, particularly as he did not meet "DOT" exemption criteria for driving with hypoglycemic episodes. (Doc. 24 at 13, citing Mehter Depo. Exh. 63). The City asserts that the Sixth Circuit has found similar evidence demonstrated an employee posed a direct threat and that removal from full duty was not discriminatory. *See Wurzel,* 2012 WL 1449683. The City also contends that other courts have found that an employee with diabetes who experienced hypoglycemic episodes constituted a direct threat such that the employee's removal from full duty was not discriminatory. *See Darnell v. Thermafiber, Inc.,* 417 F.3d 657, 661 (7th Cir. 2005); *Hutton v. Elf Atochem North America, Inc.,* 273 F.3d 884, 886-87 (9th Cir. 2001).

The burden is on the employer to show that the plaintiff is not qualified to perform the requirements of a particular job because he poses a direct threat to the health or safety of others. *See Wells,* 860 F. Supp.2d at 481. The regulations accompanying the ADA explain the meaning of "direct threat" as follows:

> Direct Threat means a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation. The determination that an individual poses a "direct threat" shall be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job. This assessment shall be based on a reasonable medical judgment that relies on the most current medical

knowledge and/or on the best available objective evidence. In determining whether an individual would pose a direct threat, the factors to be considered include:

(1) The duration of the risk;
(2) The nature and severity of the potential harm;
(3) The likelihood that the potential harm will occur; and
(4) The imminence of the potential harm.

29 C.F.R. § 1630.2(r).

Here, there is a question of fact as to whether plaintiff posed a direct threat to his safety or that of others such that he was not qualified for a full duty firefighter position. The present case is distinguishable from *Wurzel* and the other cases on which the City relies in support of its direct threat defense. The Court in *Wurzel* granted summary judgment in favor of the defendant because it found no reasonable juror could disagree with the defendant's determination that its employee posed a direct threat to his own safety and that of others in the plant. *Wurzel*, 2012 WL 1449683. The Court found the defendant's determination was based on a reasonable medical judgment, it relied on the most current medical judgment and best available objective evidence, and it reflected an individualized assessment of the plaintiff's abilities. *Id.*, at *12. The Court further determined that a reasonable juror could not find there was evidence of a reasonably based medical judgment supporting the opposite view that the plaintiff did not pose a direct threat. *Id.* Similarly, in *Darnell*, 417 F.3d at 661, there was not sufficient conflicting medical evidence, and in *Hutton*, 273 F.3d at 894, the Court was unable to rule out the possibility of a hypoglycemic event under circumstances where a single physical or mental lapse could result in harm of significant potential severity to the plaintiff's co-workers and others. Here, however, the only evidence the City cites to show plaintiff posed a direct threat is Dr. Kelley's examination report following plaintiff's 2007 hospitalization. Plaintiff has produced medical opinions and evidence that are contrary to Dr. Kelley's opinion and that cover the time period

subsequent to September 2007.  Thus, there is conflicting medical evidence such that the City has not established its direct threat defense as a matter of law.

In short, plaintiff has come forward with evidence which, if accepted as true, would allow a reasonable jury to find that the City regarded him as disabled during the 2007-2008 time frame when he was restricted to light duty; he was qualified to perform unrestricted firefighting duties during this time period; he was not a direct threat to the safety or health of others; and he suffered an adverse employment decision because the City regarded him as disabled. Accordingly, the City is not entitled to summary judgment on plaintiff's ADA and Ohio claims premised on this adverse action.

The second adverse employment action is the City's refusal to reinstate plaintiff to full-duty status from 2009 to 2011.  Plaintiff claims that the City's refusal violated the ADAAA and the Ohio statute.

The definition of disability under the ADAAA is found at 42 U.S.C. § 12102(1).  Under the ADAAA, "disability" means:

> (A) a physical or mental impairment that substantially limits one or more major life activities of such individual;
> (B) a record of such an impairment; or
> (C) being regarded as having such an impairment (as described in paragraph (3)).

Paragraph 3 states:

> (A) An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.
> (B) Paragraph (1)(C) shall not apply to impairments that are transitory and minor. A transitory impairment is an impairment with an actual or expected duration of 6 months or less.

Under the ADAAA, "disability" is to "be construed in favor of broad coverage of individuals" to the maximum extent permissible under the terms of the Act. 42 U.S.C. § 12102(4)(A). The term "substantially limits" as used under the ADAAA is "not meant to be a demanding standard." 29 C.F.R. § 1630.2(j)(1)(i). The regulations accompanying the ADAAA explain: "An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." 29 C.F.R. § 1630.2(j)(1)(ii). An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active. 29 C.F.R. § 1620.2(j)(1)(vii).

In contrast to the pre-amendment statute, under the ADAAA, a plaintiff proceeding under the "regarded as" prong of the disability definition need only prove the existence of an impairment that is neither transitory (*i.e.,* having an actual or expected duration of 6 months or less) nor minor to be covered under the ADAAA. The individual no longer is required to prove that the employer regarded his impairment as substantially limiting a major life activity. *See* § 12102(1)(C); 29 C.F.R. § 1630.2(l)(l) (2012) (an individual is "regarded as having [a disabling] impairment" if the individual is subjected to a prohibited action because of an actual or perceived physical or mental impairment, whether or not that impairment substantially limits, or is perceived to substantially limit, a major life activity).

The City alleges it was proper to place plaintiff on limited duty during the 2009-2011 time frame given his health issues during this time period. The City contends that plaintiff's own cardiologist removed him from full duty for several months, plaintiff was hospitalized for several days for multiple issues, and plaintiff had heart valve surgery and a kidney transplant. The City also states that plaintiff requested in the October 1, 2009 grievance he filed that he be permitted to

remain in a limited-duty status rather than be returned to full duty pending the final outcome of the third-party physician review process. (Doc. 24 at 12, citing Pltf. Depo. Exh. 11).

For the reasons stated in connection with plaintiff's claim for the 2007-2008 time period, the Court finds there are genuine issues of material fact as to whether the City regarded plaintiff as disabled under the more lenient ADAAA standard during the 2009-2011 time frame. Furthermore, there are genuine issues as to whether plaintiff was qualified to perform unrestricted firefighting duties during portions of the 2009-2011 time period but was nonetheless precluded from returning to work. The evidence shows that plaintiff was not on full duty status for a number of reasons during this time frame. The City began the medical separation process for plaintiff in 2009 based on his refusal to release his medical records and then removed plaintiff from paid limited duty status in November 2009. However, for the reasons explained below, there are issues of fact as to whether the City was entitled to the records it required plaintiff to provide. In addition, although plaintiff had a number of health issues during this time period, his treating physicians imposed only temporary restrictions as a result of these conditions. He was off work for five weeks in June 2010 for heart valve surgery and for six weeks in November 2010 for a kidney transplant. His treating physicians released him for full duty in January 2011 and in May 2011 the third-party physician found plaintiff could return to full duty. Furthermore, the fact that plaintiff asked to remain on limited duty in his October 1, 2009 grievance is not dispositive of whether he was qualified to perform unrestricted firefighting duties during the entire 2009-2011 period as plaintiff requested to remain in limited duty status only during the pendency of the third-physician review process then underway in lieu of being medically separated. (Doc. 23, Exh. 11). Thus, the evidence does not show that plaintiff was unqualified to perform unrestricted firefighting duties for the entirety of the 2009-2011 time

period.  Finally, the City has not produced evidence to show that plaintiff posed a direct threat to the safety or health of himself or others during this time frame.  The City is therefore not entitled to summary judgment on  plaintiff's claim pertaining to the 2009-2011 time period.

Third, plaintiff claims that the City violated 42 U.S.C. § 12112(d)(4)(A) by requesting his medical records in November 2009 and then removing him from paid limited-duty status for refusing to provide these records.  (Doc. 30 at 19-20).  Section 12112(d)(4)(A) provides: "A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity."  Plaintiff alleges the City violated the statute because the requested records were not related to his fitness for duty as they were over two years old; EHS had already determined that plaintiff was permanently restricted from full-duty firefighting; and plaintiff had provided recent records from his own physicians substantiating his fitness for duty.  The City argues it followed the procedures outlined under the LMA, and the evidence amply demonstrates that the request for records and subsequent action based on plaintiff's refusal to provide the records were justified.  (Doc. 32 at 3-5).

Plaintiff has raised genuine issues of fact as to whether the City violated his rights under the ADAAA by removing him from limited-duty status in November 2009 for refusing to disclose certain medical records.  There is evidence that calls into question whether the records were related to plaintiff's ability to perform his job and whether the request was consistent with business necessity.  Thus, the City is not entitled to summary judgment on this claim.

The fourth adverse action is plaintiff's removal from the PTP in November 2009.  The City contends that plaintiff cannot meet the "disability" standard of the ADAAA with regard to

his removal from the PTP because the record shows plaintiff suffered temporary disabilities and was therefore properly placed on limited duty pursuant to § 32.8 of the LMA. (Doc. 24 at 12). The City states it removed plaintiff from the PTP based on his inability to obtain the necessary "ride time" resulting from his limited-duty status and not because of a perceived disability. The City asserts that ride-time requirements must be fulfilled in order to complete the PTP under Ohio law. The City also asserts that plaintiff acknowledged it was not possible to accumulate ride time on City vehicles as he was on limited-duty status, and all individuals on City vehicles must be able to perform full duty. Although plaintiff was initially advised he could obtain his ride time through another fire department, the City determined this option was unworkable. (Doc. 24 at 13-14).

There is direct evidence that the City took plaintiff's diabetic and kidney conditions into account when refusing to allow him to complete the PTP, so it is appropriate to analyze this adverse action under the direct evidence framework. There are issues of fact under the more liberal ADAAA standard as to whether the City regarded plaintiff as having a disabling impairment and removed plaintiff from the PTP because it perceived him to be restricted to limited, and not full, firefighting duties as a result of his diabetic and kidney conditions. Plaintiff has presented evidence that he was qualified to perform unrestricted firefighting duties and complete the requirements of the PTP. There is evidence that plaintiff's own physicians had attested to his capability to perform unrestricted firefighting duties, and Dr. Locasto expressed his preference that plaintiff perform his ride time on City units, but the City rejected his recommendation. (Doc. 30 at 18, citing Locasto Depo at 24, Locasto Depo. Exhs. 36, 38). The City has not produced evidence to show plaintiff's participation in the program would have

posed a direct threat to his safety or to the safety of others. Accordingly, plaintiff has come forward with sufficient evidence to proceed to trial on this portion of his discrimination claim.

In sum, there is sufficient evidence for plaintiff to proceed to a jury on his claims that the City violated his rights under the federal and state anti-discrimination laws by refusing to allow plaintiff to return to full firefighting duties following his hospitalization in September 2007 and throughout 2008; by refusing to allow plaintiff to complete the PTP; by restricting plaintiff to limited duty from 2009 to 2011; and by removing plaintiff from limited duty for refusing to provide certain medical records. Although the City has asserted that plaintiff posed a direct threat to himself or others, the evidence plaintiff has presented is sufficient to call into question the validity of the City's allegation. These issues cannot be resolved without weighing the evidence and making credibility determinations, which are functions that must be performed by the trier-of-fact. Accordingly, the City is not entitled to summary judgment on plaintiff's disability discrimination claims against it.

## B. Retaliation claim against the City

Plaintiff brings a retaliation claim against the City under Ohio law. Plaintiff has clarified the factual basis for this claim in his response to the City's motion for summary judgment. Plaintiff alleges that he engaged in protected activity by filing a charge of discrimination with the OCRC and the Equal Employment Opportunity Commission ("EEOC") on or about April 20, 2009, alleging that the City discriminated against him on the basis of a perceived disability by removing him from the PTP. (Doc. 30 at 20). Plaintiff asserts that the City was aware of the charge. Plaintiff testified at his deposition that he had a conversation with Assistant Fire Chief Corbett in October 2009 during which Corbett offered plaintiff the opportunity to return to "paramedic school" if plaintiff dropped his EEOC complaint. (Pltf. Depo. at 78-81). Plaintiff

contends that after he refused to drop the charge, he was removed from limited-duty status and placed in unpaid status. (Doc. 30 at 20, citing Wright Depo. at 30-31). Plaintiff claims this action was taken against him in retaliation for filing the charge.

The City contends that plaintiff cannot establish a causal connection between the filing of his EEOC charge on April 20, 2009, and his removal from limited duty effective October 15, 2009. The City asserts that plaintiff's removal from limited duty was not in retaliation for the filing of his EEOC charge but was in response to plaintiff's refusal to release his medical records. (Doc. 32 at 8). The City contends that plaintiff acknowledged this as the reason for his removal from limited duty in a union grievance he filed on October 1, 2009. (Doc. 32 at 8, citing Pltf. Depo. Exh. 11). The City states that the five-month gap between the filing of the charge and plaintiff's removal from limited duty is insufficient, in the absence of other compelling evidence, to establish a causal connection between the two events. (Doc. 32 at 8-9, citing *Boggs v. The Scotts Co.*, No. 04AP-425, 2005 WL 647560, at *8 (Ohio App. 10th Dist. March 22, 2005) ("[T]emporal proximity alone does not support a claim of retaliation if there is no other compelling evidence.")).

Ohio law provides that it is unlawful for "any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice . . . ." Ohio Rev. Code § 4112.02(I). To establish a prima facie case of retaliation under Ohio law, the plaintiff must show that "(1) [he] engaged in a protected activity, (2) the defending party was aware that the [plaintiff] had engaged in that activity, (3) the defending party took an adverse employment action against the employee, and (4) there is a causal connection between the protected activity and [the] adverse action." *Greer-Burger v. Temesi*, 879 N.E.2d 174, 180 (Ohio 2007) (citing *Canitia v. Yellow Freight Sys., Inc.*, 903 F.2d 1064, 1066 (6th Cir. 1990);

28

*Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 544 (6th Cir. 2008)). If the plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate reason for its action. *Id.* If the defendant does so, the burden then shifts back to the plaintiff to demonstrate that the proffered reason was a pretext for retaliation. *Id.*

Plaintiff has produced sufficient evidence to proceed to a jury on his retaliation claim. Plaintiff engaged in protected conduct by filing an EEOC charge in April 2009. Plaintiff was subjected to an adverse action in October 2009 when he was removed from limited-duty status and placed in unpaid status. Plaintiff relies on more than temporal proximity to establish a causal connection between the two events. Plaintiff testified at his deposition that he was removed from limited-duty status shortly after he refused the City's offer to allow him to return to paramedic school in exchange for dropping the EEOC charge. (Pltf. Depo. at 78-81). A reasonable jury could infer from this evidence that there was a causal connection between plaintiff's filing of the EEOC charge and the City's decision to remove plaintiff from limited-duty status. It is for the jury to decide whether to draw the inference or to accept the legitimate non-retaliatory reason asserted by the City for its action. The City therefore is not entitled to summary judgment on plaintiff's retaliation claim.

### IV. Plaintiff's claims against defendant Wright

Defendant Wright moves for summary judgment on all claims against him. First, Wright argues that he cannot be held personally liable for a violation of the ADA. (Doc. 22 at 20, citing *Sullivan v. River Valley School Dist.*, 197 F.3d 804, 808 n.1 (6th Cir. 1991); *Wms. v. McLemore*, 247 F. App'x 1, 8 (6th Cir. 2007)). Second, Wright alleges that he can be held liable under Ohio law only for his own discriminatory conduct occurring in the workplace. (Doc. 22 at 21, citing *Genaro v. Cent. Transport, Inc.*, 703 N.E.2d 782 (Ohio 1999)). Wright contends he did not

violate plaintiff's rights under the Ohio anti-discrimination statute by refusing to return plaintiff to full-duty status from October 2007 forward and by removing plaintiff from the City's PTP in April 2009. In addition, Wright contends that plaintiff cannot establish a claim of retaliation against him because there is no evidence of a causal connection between plaintiff's filing of his EEOC charge and Wright's decision to remove him from limited-duty status. Wright further argues that plaintiff's claims based on Wright's failure to return plaintiff to unrestricted duty are preempted by the Labor Management Relations Act (LMRA) because they require an interpretation of the collective bargaining agreement between the City and the union. In addition, Wright contends that he is immune from suit under Ohio Rev. Code Ch. 2744. Finally, Wright contends he is entitled to summary judgment on plaintiff's claim for punitive damages because plaintiff cannot establish actual malice.

### A. Wright is subject to liability on certain claims.

A manager or supervisor who does not otherwise qualify as an employer cannot be held personally liable under the ADA. *See Wathen v. General Electric.,* 115 F.3d 400 (6th Cir. 1997). For purposes of Ohio Rev. Code Chapter 4112, however, a supervisor/manager may be held jointly and/or severally liable with his employer for the supervisor/manager's own discriminatory conduct. *Genaro*, 703 N.E.2d 782. Thus, Wright can potentially be held liable for disability discrimination only under Ohio law.

Before turning to the merits of plaintiff's disability discrimination claims, the Court will address Wright's LMRA preemption and statutory immunity arguments. Wright argues that plaintiff's claim of disability discrimination based on Wright's failure to return him to full duty is preempted by the LMRA because the LMA must be interpreted in order to determine whether Wright had the authority to return plaintiff to unrestricted duty. Section 301 of the LMRA

preempts "any state-law claim arising from a breach of a collective bargaining agreement." *Mattis v. Massman*, 355 F.3d 902, 905 (6th Cir. 2004) (citing *Smolarek v. Chrysler Corp.*, 879 F.2d 1326, 1329 (6th Cir. 1989) (en banc)).  A two-step inquiry must be undertaken to determine whether a state-law claim survives § 301 preemption: (1) whether resolving the state-law claim would require interpretation of the terms of the collective bargaining agreement; and (2) whether the rights claimed by the plaintiff were created by the collective bargaining agreement or instead by state law. *Id.* at 906 (citing *DeCoe v. G.M. Corp.*, 32 F.3d 212, 216 (6th Cir. 1994)).  If a state-law claim fails either of these two requirements, it is preempted by § 301. *Id.*

The Court finds that § 301 preemption does not apply here.  First, the ultimate issue of whether Wright refused to return plaintiff to full duty because Wright perceived him as disabled does not depend upon an interpretation of the LMA.  To the contrary, there is no disagreement regarding the pertinent provisions of the LMA and their applicability to this case insofar as they pertain to Wright's exercise of discretion.  Second, the right to be free from disability discrimination is derived from Ohio's anti-discrimination statute rather than the collective bargaining agreement.  Accordingly, neither prong of the two-part test for preemption is satisfied.

Nor is Wright shielded from personal liability for plaintiff's discrimination and retaliation claims by the statutory immunity provision of Ohio Rev. Code § 2744.03. Pursuant to that provision, employees of political subdivisions are generally immune from liability unless one of the following applies:

> (a) The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities;
> (b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner;
> (c) Civil liability is expressly imposed upon the employee by a section of the Revised Code. . . .

Ohio Rev. Code § 2744.03(A)(6). Wright asserts that none of the exceptions to statutory immunity are present in this case. He argues there is no dispute he was acting within the scope of his duties when he made decisions concerning plaintiff's employment; no reasonable jury could find that his acts or omissions rose to the level of egregiousness described in subsection (b); and although Ohio appellate courts have reached different conclusions as to whether Ohio Rev. Code Ch. 4112 expressly imposes liability upon supervisors and managers of political subdivisions charged with discrimination, the Court should follow the decision of the lone Ohio appellate court that has determined there is no supervisory liability under the anti-discrimination statute. (Doc. 22 at 37-38, citing cases).

Wright's argument is not well-taken. Two judges in this district have previously decided that the third exception to statutory immunity applies to a claim brought under Chapter 4112. See *Conant v. Delaware County Bd. of County Com'rs*, No. 2:10-cv-221, 2011 WL 4383444, at *12 (S.D. Ohio Sept. 19, 2011) (Sargus, J.); *Satterfield v. Karnes*, 736 F.Supp.2d 1138, 1151-54 (S.D. Ohio 2010) (Holschuh, J.). The Court adopts the reasoning of those decisions and finds that as the potential for civil liability is imposed on Wright by Chapter 4112, statutory immunity is inapplicable to him.

### B. Wright is not entitled to summary judgment on all claims.

Turning to the merits of plaintiff's claims, the Court will address each of the adverse actions alleged by plaintiff. The first purported adverse action is Wright's order that plaintiff submit to a fitness-for-duty examination in 2007 followed by Wright's refusal to return plaintiff to unrestricted duty from 2007 to 2008 based on the results of the examination. Plaintiff assumes for purposes of his summary judgment motion that direct evidence of discrimination by Wright does not exist. (Doc. 31 at 4). Plaintiff argues, however, that he can establish a prima facie case

of discrimination against defendant Wright.  Plaintiff contends that Wright ordered the fitness-for-duty examination without a proper basis for doing so and then used the "illegal examination" to obtain an opinion from EHS upon which Wright could rely to remove plaintiff from full-duty. (Doc. 31 at 6-7).  Plaintiff contends that although Wright denies he could have returned plaintiff to full-duty absent a third-party physician's recommendation, District Chief Texter contradicted Wright's testimony and testified that Wright did have such authority.  (Texter Depo. at 54-55).

Wright argues that plaintiff has failed to set forth a prima facie case of discrimination as to the fitness-for-duty examination because plaintiff cannot show (1) that a demand for a valid fitness-for-duty examination is an adverse action, or (2) that plaintiff was a qualified individual with a disability.  (Doc. 22 at 24).  Wright further contends that plaintiff has not shown that his reason for leaving plaintiff on limited duty after the initial fitness-for-duty examination in 2007 was a pretext for discrimination.  (*Id.* at 24-27).  Wright asserts he did not return plaintiff to unrestricted duty at any point between 2007 and Wright's retirement in early 2011 because Wright did not have the authority under the LMA to do so.  Wright asserts he was precluded by § 32.8 of the LMA from removing plaintiff from limited duty before a third-party physician review was conducted.  Wright states that pursuant to § 32.8, once an EHS physician determines that an employee is unable to function safely as a firefighter, the Fire Chief has the discretion to either (1) place the employee on limited duty, or (2) decline to return the employee to work in any capacity.  (*Id.* at 25).  Wright asserts that the Fire Chief does not have the discretion to override the EHS physician's opinion that the employee is unable to function as a full-duty firefighter, even if the employee's personal physician has released him for unrestricted duty.  (Doc. 22 at 25, citing Wright Depo. at 26, Texter Depo. at 49-50).  Rather, in that instance, a third-party physician must be consulted to resolve the conflict.  (Pltf. Depo. Exh. 11, LMA § 28.12).  Wright

argues that even if he had the authority to override EHS's decision to place plaintiff on limited-duty status, no reasonable juror could find that he failed to do so because he perceived plaintiff to be disabled. (Doc. 22 at 26-27). Wright alleges that he cannot be faulted for relying on the professional opinions of the EHS physicians. (*Id.*).

The Court finds that plaintiff has not come forward with sufficient evidence to raise a genuine issue of material fact as to whether Wright violated the Ohio Civil Rights statute by ordering a fitness-for-duty examination in 2007 and then refusing to reinstate plaintiff to full duty at any time during the 2007-2008 time frame. First, plaintiff has not shown that Wright acted improperly by ordering the fitness-for-duty examination. The evidence shows that it was reported to Wright in September 2007 that plaintiff had pneumonia. (Wright Depo. at 24). According to plaintiff's own testimony, Wright had the discretion under the terms of the LMA to require plaintiff to submit to a fitness-for-duty examination following his hospitalization and pneumonia diagnosis in September 2007. (Pltf. Depo. at 144-147).

Second, the only evidence plaintiff points to as "the basis" for Wright's decision to not return plaintiff to full duty is Dr. Kelley's memorandum opining that plaintiff was unable to work a broad class of jobs (*i.e.,* driving City vehicles, working around open dangerous machinery, or working at unprotected heights). (Mehter Depo. Ex. 60). Although plaintiff asserts that Wright had the authority to return plaintiff to full duty despite the opinion of the EHS physician that he was not fit for such duty (Doc. 31 at 9, citing Texter Depo. at 54-55), Texter testified only that as a department head Wright "probably could" do so. Texter clarified that Wright generally would not overrule the EHS's decision under such circumstances because Wright would then become liable for any injury or illness suffered by that individual, and Texter was not aware of anyone for whom Wright had overridden the decision of the EHS physician.

(Texter Depo. at 54-55). Texter's testimony thus shows that Wright followed the standard procedure in not returning plaintiff to full duty under the circumstances and does not permit an inference that Wright acted as he did for some improper purpose. Wright was entitled to rely on the findings of the EHS physician that plaintiff was not able to return to full duty. Accordingly, plaintiff has not produced evidence to proceed to trial on his claim that Wright violated Ohio law by ordering a fitness-for-duty examination and failing to return plaintiff to full duty based on the results of that examination.

The second adverse action is Wright's refusal to reinstate plaintiff to full duty from 2009 to 2011. Plaintiff alleges that Wright could have returned him to full duty at any time absent a third-party physician's recommendation. (Doc. 31 at 10, citing Texter Depo. at 54-55). To show Wright failed to do so based on an improper motive, plaintiff points to deposition testimony that Texter and the union president heard Wright state he would not return plaintiff to full duty even if a third-party physician recommended it. (Doc. 31 at 10, citing Texter Depo. at 23; Pltf. Depo. Exh. 32).[8] The cited testimony is too vague, however, to carry plaintiff's burden to show that Wright perceived him as disabled and would have reinstated him to full duty at any time between 2009 to 2011 but for the perceived disability. Texter actually testified that he *believes* he heard Wright indicate during a discussion that plaintiff would not be returned to full duty even if a third-party physician recommended his return, but Texter does not know when the discussion took place and he does not know the context in which Wright made the statement. (Texter Depo. at 23). Plaintiff has not produced any other evidence to carry his burden on his discrimination claim against Wright for this time period. Therefore, Wright is entitled to summary judgment on this claim.

_____

[8]Plaintiff has not submitted this deposition exhibit and it is not part of the record before the Court.

The third adverse action is plaintiff's dismissal from the City's PTP. Plaintiff disputes Wright's contentions that (1) defendants were justified in placing him on limited-duty status, and (2) being on limited duty automatically rendered him unable to fulfill the ride time requirements. Plaintiff argues that his treating physicians attested to his ability to perform unrestricted firefighting duties. Further, he contends that even if the City could have restricted him from full-duty firefighting, his preclusion from the PTP was discriminatory because it was based on misguided assumptions rather than an analysis of how his medical condition affected his ability to perform the program requirements. Plaintiff alleges that Wright disregarded recommendations that the City Medical Director, Dr. Locasto, made on January 15, 2009 and March 4, 2009, that plaintiff be permitted to perform his ride time on City units (Doc. 31 at 12, citing Locasto Depo. at 24, Locasto Depo. Exhs. 36, 38), and plaintiff notes that Dr. Locasto testified that plaintiff would not have been prevented by his dialysis needs from performing his ride time on City units. (Doc. 31 at 12, citing Locasto Depo. at 18). Plaintiff further relies on the testimony of Assistant Fire Chief Corbett that plaintiff was treated differently than other firefighters who were permitted to complete ride-time requirements while on limited duty. (*Id.* at 13, citing Corbett Depo. at 46, 48). Plaintiff argues that a reasonable trier-of-fact could conclude based on the evidence that he was treated differently than similarly-situated individuals on limited duty and that but for Wright's perception that he was disabled, he would have been permitted to remain in the PTP. (*Id.* at 13).

Wright assumes plaintiff can establish a prima facie case of discrimination as to this claim but asserts a legitimate non-discriminatory reason for plaintiff's removal from the program, *i.e.,* his limited-duty status rendered him unable to meet the training program's ride time requirements because the City has a policy against permitting firefighters on limited duty

from riding on rescue units. (Doc. 22 at 28-29; Doc. 33 at 11, citing Corbett Depo. at 12; Pltf. Depo. Exh. 36). Defendant Wright disputes that plaintiff was similarly-situated with the individuals to whom he seeks to compare himself and asserts that plaintiff provides no details about pregnant female firefighters who allegedly were allowed to do ride-time while on limited duty.

Plaintiff has come forward with evidence that raises a genuine issue of material fact as to the legitimacy of the stated reason for his withdrawal from the PTP. Specifically, plaintiff has called into question whether he was treated differently than similarly-situated firefighters who participated in the PTP. Assistant Fire Chief Corbett testified that he told Wright that he did not think Wright should remove plaintiff from the PTP. (Corbett Depo. at 47). Corbett stated he disagreed with Wright's decision to withdraw plaintiff from the PTP because he thought "we were treating him different than they treated other people." (Corbett Depo. at 45). Specifically, Corbett testified that he thought plaintiff was being treated differently than other firefighters who had been on light duty status and were allowed to complete paramedic training classes. (*Id.* at 45-47). Wright asserts that the situations of these individuals differed from plaintiff's situation. Wright notes that Corbett testified he did not believe firefighter Haki Zuberi took the training in-house or through any of the City's programs and firefighter Vernon Simpson, who was in the first class of graduates from the PTP, was likewise unable to complete ride time due to his limited duty status and did not complete the requirement until he returned to full duty. (Doc. 33 at 12, citing Corbett Depo. at 46-47). However, Corbett's testimony indicates that in contrast to plaintiff, these individuals were permitted to participate in the PTP despite being on light duty status. (*Id.* at 46-47). The evidence presents an issue as to whether plaintiff was treated differently from similarly-situated individuals and was forced to withdraw from the PTP program

based on a perceived disability.  Plaintiff is therefore entitled to proceed to a jury on this claim against defendant Wright.

The fourth adverse action is Wright's acting in concert with EHS to coerce plaintiff into providing his medical records in violation of 42 U.S.C. § 12112(d)(4)(A).  Because plaintiff concedes that Wright cannot be held liable for a violation of the ADA or ADAAA, Wright is entitled to summary judgment on this claim.

Plaintiff also brings a retaliation claim against Wright under Ohio law, alleging that Wright removed him from limited-duty status in retaliation for filing the EEOC charge in April 2009.  Plaintiff testified at his deposition that he was removed from limited-duty status shortly after he refused the City's offer to allow him to return to paramedic school in exchange for dropping the EEOC charge.  (Pltf. Depo. at 78-81).  Plaintiff asserts that the short time frame between Corbett's request that he drop his charge and Wright's decision to remove him from limited-duty status is sufficient to establish a causal connection between the two events.

Wright argues there is no evidence of a causal connection between plaintiff's filing of the EEOC charge in April 2009 and his decision to remove plaintiff from full-duty status.  Wright contends his decision was based on plaintiff's refusal to sign a medical release so that EHS physicians could have access to his medical records.  (Wright Depo. at 30-31).  Wright asserts there is no evidence he was aware any City employee had asked plaintiff to drop his discrimination charge.  (Doc. 33 at 14).  Wright further notes that although plaintiff testified that Corbett asked him to drop his charge in October 2009, this was after Texter had written to plaintiff and informed him that his continued refusal to release medical records to EHS would result in termination of his limited duty status.  (*Id.* at 14, citing Pltf. Depo. Exh. 17).

A reasonable jury could reasonably infer that there was a causal connection between plaintiff's filing of the EEOC charge and Wright's decision to remove plaintiff from limited-duty status. Corbett testified that there had been discussions within the Fire Department about presenting a proposal to plaintiff to allow him to return to the PTP if he dropped his charge against the City, and it was his impression Wright was trying to make things difficult for plaintiff. (Corbett Depo. at 24-25). A reasonable juror could infer that as Fire Chief, Wright was involved in these discussions about presenting a proposal to plaintiff to withdraw his charge. Although Wright articulated a legitimate reason for plaintiff's removal from the PTP, it is up to the jury to determine whether the decision to remove plaintiff from limited duty status was made in retaliation for plaintiff's refusal to withdraw the charge, or whether it was based on plaintiff's refusal to release his medical records. Because the Court cannot weigh the evidence and make credibility determinations necessary to resolve this issue, Wright is not entitled to summary judgment on plaintiff's retaliation claim.

Finally, Wright contends that plaintiff's claim for punitive damages must be dismissed because no reasonable juror could find that Wright acted with actual malice. Wright relies on plaintiff's deposition testimony that the two individuals had no communications and "no relationship" as of 2007 to show Wright could not have acted with actual malice. (Doc. 22 at 36, citing Pltf. Depo. at 147, 173). Plaintiff contends there is evidence that Wright harbored hatred and ill will toward him. In addition to evidence plaintiff has previously cited to demonstrate that Wright discriminated against him, plaintiff relies on Corbett's testimony that it was his impression Wright tried to make things difficult for plaintiff and that Wright appeared to be upset when talking about plaintiff. (Doc. 31 at 18, citing Corbett Depo. at 25-26).

Punitive damages may be awarded in an action under Ohio Rev. Code § 4112.99 if there is evidence of actual malice. *Rice v. CertainTeed Corp.*, 704 N.E.2d 1217, 1221 (Ohio 1999). "Actual malice, necessary for an award of punitive damages, is (1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, *or* (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." *Preston v. Murty*, 512 N.E.2d 1174, syll. (Ohio 1987) (emphasis in original). "The first prong of actual malice has also been defined as conduct characterized by 'retaliation, or a determination to vent . . . feelings upon other persons.'" *Meyers v. Hot Bagels Factory, Inc.*, 721 N.E.2d 1068, 1078 (Ohio App. 1st Dist. 1999). Actual malice may be inferred from conduct and surrounding circumstances that may be characterized as "reckless, wanton, willful, or gross." *Id.* (citing *Calmes v. Goodyear Tire & Rubber Co.*, 575 N.E.2d 416, 419 (Ohio 1991) (quoting *Preston*, 512 N.E.2d 1174, syll.). "It is the egregiousness of the defendant's conduct that determines the appropriateness of an award of punitive damages. In Ohio, egregiousness is defined by the defendant's evil or depraved mental state or his willingness to disregard almost certain injury." *Id.*

The Court finds that plaintiff has come forward with sufficient evidence to proceed to trial on his claim for punitive damages against Wright. The evidence supporting plaintiff's retaliation claim is likewise "sufficient to show malice for purposes of punitive damages: actual malice has been defined as 'that state of mind under which a person's conduct is characterized by hatred or ill will, a spirit of revenge, *retaliation,* or a determination to vent his feelings upon other persons." *Toole v. Cook*, No. 98AP–486, 1999 WL 280804, at *7 (Ohio App. 10th Dist. 1999) (emphasis in the original) (citations omitted) (abrogated on other grounds). Accordingly, Wright is not entitled to summary judgment on the punitive damages claim.

**IT IS THEREFORE ORDERED THAT:**

1)  Defendant City of Cincinnati's motion for summary judgment (Doc. 24) is DENIED.

2)  Defendant Robert Wright's motion for summary judgment (Doc. 22) is GRANTED in

    part and DENIED in part.


Date: 11/1/12

Karen L. Litkovitz
United States Magistrate Judge